346 So.2d 827 (1977)
W. M. HEROMAN & CO., INC.
v.
SAIA ELECTRIC, INC.
No. 11304.
Court of Appeal of Louisiana, First Circuit.
May 9, 1977.
*828 Robert L. Kleinpeter, Baton Rouge, for plaintiff W. M. Heroman & Co., Inc., appellee.
Leon Gary, Jr., Baton Rouge, for defendant Saia Electric, Inc., appellant.
Before ELLIS, CHIASSON and PONDER, JJ.
ELLIS, Judge:
The trial judge herein assigned the following written reasons for judgment:
"This suit emanates from the renovation of the Capitol House Hotel, wherein the plaintiff, W. M. Heroman & Company, Inc., as the general contractor of the project, contends that it had negotiated a bid price for the electrical work with Saia Electric, Inc., which defendant subsequently declined to honor at the agreed price after the project was let by the owner, causing the plaintiff to secure another electrical subcontractor to do the work at an increased cost of $96,180.23.
"The testimony reflects that initially the owners of the Capitol House Hotel placed for competitive bids the work to be done under the project, but when the bids came in greatly in excess of the amount allotted for the project, the owners rejected all of the bids. Saia had submitted a bid for the electrical work to be done with Pittman Construction Company, who had been one of the principal bidders for the job. The owners then sought to negotiate a bid with Heroman during the spring of 1973. Saia's sales representative, A. T. Sanders, Jr., contacted Heroman in an effort to secure the electrical contract on the job. After securing the approval of the Capitol House owners, Heroman agreed to negotiate a price with Saia for the electrical work. These negotiations were conducted principally with G. T. Bourg employed by Saia as senior estimator and engineer. The original estimate furnished by him for Saia on May 17, 1973, was in the amount of $335,125.00. Because the overall price of the project still exceeded the amount available for construction, Perry Segura and Don Chesson, the architect and consulting engineer, respectively, made further changes and alterations which would reduce the overall cost. As a result of their efforts, the seven addenda to the plans prepared by Chesson were finally consolidated into Addenda # 8 which represented the cumulation of the earlier changes. The effect of these changes was to reduce the scope of the electrical and mechanical work contemplated under the project. The final negotiations concerning the prices to be submitted by the various subcontractors were held at Heroman's office a few days prior to September 10, 1973, when the eighth addenda was dated and executed. Attending this meeting were James Pat Miller, representing *829 the plumbing contractor, Mr. Bourg of Saia, Chesson and Heroman. It was the understanding of the other participants that the meeting was held to "nail down the bids" and there was no doubt in any of their minds that Heroman would use their bids for the purpose of submitting a final bid to the owner. Bourg acknowledged that he assumed Heroman was going to use Saia's bid of $214,600.00 for inclusion in Heroman's total bid price and that as far as he knew Heroman had been exclusively negotiating with Saia for the electrical work to be done on the job. The contract was not let until December 6, 1973, approximately three months later.
"There is a disparity between the witnesses' testimony concerning what transpired between the date of the meeting and the date of the execution of the contract. Heroman testified that to the best of his knowledge he confirmed the price with Bourg before submitting the bid. Not only Miller, but Gerald recalled that Heroman called them to confirm the bids which they had respectively submitted. However, Bourg and LeBlanc, Saia's executive vice president, denied that they had been contacted by Heroman or any of his representatives. The weight of the testimony and the inferences to be gained from the evidence seem to indicate that there was some discussion between Heroman and Bourg during the three month interval and that Bourg, as Saia's representative was well aware that the project had not been shelved, but was moving along toward fruition. Certainly the testimony of the two other subcontractors, Miller and Gerald support such a finding.
"Following the execution of the contract, Heroman called Bourg to advise him that his firm had been awarded the contract and to pick up the plans. After some delay, the plans were picked up by Bourg. Shortly after the first of the year, Heroman began to get anxious in commencing the initial phase of the job which included the electrical work and called Bourg for the purpose of discussions toward this end. In response to this request, Saia submitted a new bid of $396,305.00. Heroman expressed surprise and Saia apparently recomputed its bid, reducing it to $269,000.00. There were some efforts to mediate the issue in which Heroman expressed a willingness to split the difference between Saia's $214,600.00 initial bid and its latest bid of $269,000.00. These efforts met without success.
"Heroman, finding he was running short of time, negotiated a cost plus (10% overhead and 10% profit) agreement with Coors Electric to perform the work. The total of all payments under this contract amounted to $310,180.23.
"The defendant in its answer denied that it ever gave a final bid or a binding bid. While not contained in its pleadings, its argument essentially is that no contract was entered into between it and the plaintiff and it therefore has no liability. The evidence clearly refutes its contention that it did not furnish a final bid, therefore the question is whether it submitted a `binding bid.'
"The general rule relating to offer and acceptance is stated in LSA-C.C. Art. 1800, which states:
`The contract, consisting of a proposition and the consent to it, the agreement is incomplete until the acceptance of the person to whom it is proposed. If he, who proposes, should before that consent is given, change his intention on the subject, the concurrence of the two wills is wanting and there is no contract.'
"However, as stated in LSA-C.C. Art. 1809, an offer, under certain circumstances, may remain irrevocable until the offeree is afforded a reasonable time to accept. Specifically this article declares:
`The obligation of a contract not being complete, until the acceptance, or in cases where it is implied by law, until the circumstances, which raise such implication, are known to the party proposing; he may therefore revoke his offer or proposition before such acceptance, but not without allowing such reasonable time as from the terms of his offer he has given, or from the circumstances of the case he may be supposed to have intended to give *830 to the party, to communicate his determination.'
As stated in National Co. v. Navarro, 149 So.2d 648 (La.App. 4th Cir. 1963):
`This article obviously places a limitation upon the general rule that offers may be revoked any time before they are accepted, and is applicable where the offeror has expressly stated an intention to make the offer irrevocable within a stipulated period of time or where the offer is of such a nature that from its very terminology the implication is present that the offeror intended to make it irrevocable for a reasonable period of time, within which it would be necessary for the offeree to signify his acceptance.'
While not considering Article 1809 appropriate to the particular facts in dispute, the court in Navarro noted the circumstances wherein it might be applicable and furnished the following illustration:
`A more modern version of the above example might exist when a custom prevails in the building trade to the effect that a subcontractor's bid to a general contractor, in the absence of a provision to the contrary, may be considered irrevocable after it has been used in preparation of the general contractor's bid to the owner, and has been accepted by the owner prior to the attempted revocation by the subcontractor.'
A case of similar import is Claitor v. Delta Corporation of Baton Rouge, Inc., 279 So.2d 731 (La.App. 1st Cir. 1973). Although not involving the identical situation, the court found therein that the bid which had been submitted was irrevocable and the contractor was obligated to maintain its offer open and acceptable for a period of 30 days from the time of opening of the bid. Recognizing the concept of the irrevocability of an offer is an article in 23 Louisiana Law Review, Page 796, wherein it is stated:
`Although Article 1800 might imply Louisiana followed the general common law rule that an offer may be revoked at any time prior to acceptance, Article 1809 shows otherwise. Article 1809, after stating generally that an offer may be revoked before its acceptance, provides an exception if the offeror has not first allowed "such reasonable time as from the terms of his offer he has given, or from the circumstances of the case he may supposed to have intended to give to the party to communicate his determination." In contrast to Article 1802, Article 1809 is intended to govern situations in which attempted revocation precedes acceptance. Its clear affect is to create a period during which the offeror may not revoke his offer, when such a period is either expressly provided in the terms of the offer or implied by the circumstances. Furthermore, Article 1809 by its terms requires no consideration to render effective such a provision for irrevocability. `Article 1809 is harmonious with the civilian concept that a party has legal capacity to bind himself by his will alone.'
It is the opinion of the Court that, considering all of the circumstances, Article 1809 governs the situation, and accordingly, Saia's offer to Heroman was irrevocable until such bid by the general contractor to the owner had been declined or the project had been abandoned, provided an unreasonable time had not elapsed. While the record reflects that three months did elapse before the contract was let, considering the substantial nature of the undertaking and the fact that the evidence demonstrates that as far as all were concerned, the project was proceeding toward realization, the Court determines that an unreasonable time did not elapse and the defendant is bound by its offer.
"Although not necessary to support this determination, it should be pointed out that the actions of Bourg subsequent to notification to him by Heroman that his firm had been awarded the contract, show clearly that Saia understood that it had the electrical subcontract work, and it was only after a reevaluation was made by it which indicated that the contract might not be profitable was a retiring position sought. Consequently, this conduct may also be considered an assent to the offer on the part of Saia. See Metal Bldg. Prod. Co. v. Fidelity *831 & Deposit Co. of Md., 144 So.2d 751 (La. App. 4th Cir. 1962).
"Following Saia's refusal to do the work, Heroman was obligated to farm out the work to Coors Electric on a cost plus basis. Considering the nature of the circumstances, the Court believes that the plaintiff's actions were sufficient to minimize its damages, particularly in view of the advanced stage of the project and the contractor's necessity to get the electrical work under way. However, it appears that certain minor change orders were made which were reflected in Coors' billings. The architect, Perry Segura, testified regarding the additional cost represented by these additions which should be deducted from $95,580.23, being the difference between Saia's bid of $214,600.00 and $310,180.23 billed by Coors under its agreement with Heroman. It appears from his testimony that the revisions made in Change Order No. 3 increased the electrical work to the extent of $5,354.98. Therefore, plaintiff is due $90,225.85 from the defendant in damages for defendant's failure to perform the work as committed.
"For the reasons expressed herein, judgment is rendered in favor of the plaintiff, W. M. Heroman & Company, Inc., and against the defendant, Saia Electric, Inc., in the sum of $90,225.85, together with all costs of this proceeding."
All of the assignments of error made by appellant, Saia Electric, Inc., relate to the factual conclusions of the trial court. We find that the facts as found by the trial judge are amply supported by the record, that the legal conclusions drawn therefrom are correct.
The judgment appealed from is therefore affirmed, at defendant's cost.
AFFIRMED.